The next case on the calendar for today is number 2036-26 and 2037-75, Laydon v. UBS AG et al. Mr. Citron, whenever you're ready. Good morning, your honors. Eric Citron for the appellant. May it please the court. As multiple U.S. regulators have found and multiple defendants have admitted in U.S. proceedings, the defendants conspired to manipulate what the CEA calls a, quote, commodity in interstate commerce. Congress chose to focus the CEA on protecting against manipulation of domestic commodities, and that's what the defendants did. They conspired to manipulate two things, intentionally manipulate. Two things they knew were domestic commodities, yen LIBOR and euro-yen TIBOR. So why are they commodities instead of just rates? Why are they commodities? You have to explain that to me. Why are they commodities? Oh, so the statute defines commodity very broadly, essentially backwards from the incorporation of the interest, service, rate, benchmark, into a futures contract that is traded on a U.S. exchange. And that's on purpose. Congress adopted this extremely broad definition because they wanted to protect the U.S. exchanges, which are important U.S. institutions, from manipulation. And they knew they were adopting a strange, you know, circular definition of commodity. And the way that you can tell is that they have to carve out box office receipts in 2010 as not commodities because the CFTC had just approved a futures contract based on box office receipts. So, you know, that makes them commodities. And the CFTC is... So euro-yen TIBOR is a benchmark. So which one does that fall into? Rights? Is that what you're saying? I think it would be rights. And how is a benchmark a right? Well, I guess, you know, it's... It's a number that's key. I mean, I'm just riffing off Judge Fuller's question, but it's a number that other things are key to. But how is it itself a service or a right? Maybe it's better to understand actually as an interest because euro-yen TIBOR or yen LIBOR describes the interest that one party holds in, you know, payments to be made on a debt. But really this isn't... I mean, interest rate. I don't know. An interest is in, like, a property right? Yeah, like in contracts, euro-yen LIBOR... euro-yen TIBOR or yen LIBOR are used to describe the property interest that one party has in the stream of payments under the contract. So the CME, the middle M in the CME is mercantile. What merchandise is ever involved here? You have to explain it to me. So I will be completely... I don't want to play games around it. The definition is not, like, consistent with what you would imagine a commodity is as a matter of ordinary usage. But the CFTC has had this interpretation for decades. Congress is aware of it. Congress knows that's the interpretation again because it carves out box office receipts as something that can't be a commodity. But isn't this... I mean, in the context of the CEA, if what the concern is is manipulation of markets or a commodity, to the extent that we have this kind of artificial definition of a commodity and that the manipulation, the alleged manipulation is happening abroad, it just seems like in that context, how... why should that not be considered extraterritorial? So I think it's not accurate to say that the manipulation is happening abroad. And one way to think about this is the nine of the defendants are clearing members of the CME. They are 100% aware that the CFTC, United States domestic law, treats Euro Yen Taibor and Yen Laibor as domestic commodities. And that's the first order intent of their conspiracy is to manipulate those two things. That's activity in the United States. Having an intent to commit some kind of wrongdoing in the United States is... I mean, I guess maybe you were going to get to this, but I still don't see that the manipulation is occurring in the United States. So they have this intent, and I guess you're saying they're aware that it implicates the United States, but the actual manipulation of the rates is occurring abroad. So I want to put a pin in this and say that there is also a lot of conduct that happens in the United States, conduct the court has already found is sufficient, for example, to subject these defendants to personal jurisdiction in the United States because of the domestic conduct in furtherance of the conspiracy. And that's laid out at length in our complaint. And so you could decide it just on the ground that there is plenty of domestic conduct here. But I think intent tells us what the line is between conduct and just a downstream effect. If I want to drive faster and I step on the gas, you could describe my conduct as stepping on the gas and the effect as driving faster. But to the extent that what I wanted to do was drive faster, you would say, what did he do? He drove faster. I mean, this is probably a bad example, but if you're here in New York thinking, you know, when I get to Connecticut, I'm going to speed. That's my intention. And you get to Connecticut and you speed. The idea that your intent formed somewhere else, that should still have weight in determining sort of where you're liable. Well, so it's not a question. I mean, in your example, you actually did go to Connecticut and speak, right? So there isn't any ambiguity about whether you did the conduct in Connecticut. But maybe if I could just tweak it, you know, like suppose you're standing in New York on the border and you think, you know what I really want to do? I want to project this message into Connecticut. You grab a bullhorn and you yell from New York into Connecticut, right? You're doing it in New York, but your intent was to be heard in Connecticut. And so I would say that person is speaking into Connecticut, right? That conduct is domestic to Connecticut. It would not be weird for Connecticut to regulate it. And the same is true here. No one else is going to regulate this effect on U.S. markets. No one else is going to protect our markets. Isn't it regulated in Europe? These acts of which you complain, aren't they regulated somewhere else? They regulate the effects in Europe of the conduct. But no one regulates it here except these agencies? Right, except for Congress. Congress is the sovereign that protects our markets from international acts of manipulation. But Congress has told us that we should watch out for extraterritoriality, which is a mouthful. If it's extraterritorial, we shouldn't be doing it. We shouldn't be regulating it. Well, the thing that Congress, we ask then, what did Congress choose to focus the statute on? And Prime tells us the focus of this statute is on protecting against manipulation of domestic commodities. And that's the thing defendants did on purpose, was manipulate two things they knew were domestic commodities. Can I ask you what is that? Finish your answer. I was just going to say, if the court is considering holding that these are not domestic commodities under the CEA, the consequences of that position for the CFTC's regulatory authority would be enormous. I would think the court would want to hear from the CFTC about that question and the administration. Although they're not a party here. They're not a party here, but that would be the consequence reads on to their authority in exactly the same way. Did they weigh in below? Not in this case, but they have weighed in on similar issues before. Did they weigh in on Schwab, either the Schwab cases? They were not in the Schwab cases, but they were in Prime. But this is, again, one step beyond. The defendants surely understand the domestic aspects of this conspiracy. They've pled guilty in U.S. courts. Some of their employees went to U.S. prison. This was not a controversial application of U.S. law. Can I just ask, you mentioned a lot of the criminal proceedings. What is the legal relevance of that to the determination of whether or not how the CEA applies? Or is there some relevance, is there some law that indicates that should factor into how we view this? Well, I think facts that are admitted in those proceedings are relevant in understanding, especially to the extent they're contested here. So UBS admitted, for example, to manipulating domestic commodities. So it would be hard to argue at this point that what they manipulated were not domestic commodities. The same goes for Barclays and Deutsche Bank. Well, can I ask you about the Connolly case? And specifically, what's the specific manipulative conduct here that you're alleging? Because there we said a few months ago that there isn't one true rate. And so the submission of the alleged acts of manipulation here don't seem to be necessarily false if there isn't such a truth and falsity dichotomy. So can you address that? You know, the defendants haven't made an argument based on Connolly, notwithstanding the time to submit it. I'm not sure that I'm in a position to say exactly how I would address it. But what specifically is manipulation? I mean, Connolly was a context, but what exactly is manipulation? That has to be something false. I think making a false submission would obviously be manipulative with the intent to affect the rate. That sounds like manipulation to me. And directing your subordinates to do that. How can there be a false submission in this context when there isn't? The whole thing is an amalgam, you know, a composite of information. So what we said in Connolly is that there isn't a false. There is a rule about what you are supposed to submit, which is an accurate estimate of your own borrowing costs. And that's not what the defendants were doing, and it's really obvious that that's not what they're doing. And, in fact, there are a lot in the complaint. There are discussions where one of the submitters tells his boss, look, we shouldn't be doing this. We're making these submissions based on the benefits to our own trading book and not based on any honest assessment of the market. So I do think that that would be an act of manipulation. And it would clearly be an act of manipulation also to tell your subordinates when you are in the United States to submit these false submissions to benefit your own book. And that's what Eric Bowman Sass did. And that's what this court said he did in Schwab, too, that he was in the United States directing his subordinates to manipulate LIBOR. And, in fact, it was he manages the Euro-Yen-Thai-Bor swap book. As we point out in our brief, he was trying to manipulate Yen-Libor and Euro-Yen-Thai-Bor. Thank you, counsel. You've reserved a few minutes for rebuttal. We'll hear next from Mr. Hungar. Thank you, Your Honor. It may have pleased the court. With respect to the CEA, in the first place, what this court held in prime is that the test for the application of the CEA to domestic conduct is that the focus is on manipulative conduct and the test is whether the – or, rather, the requirement is that the plaintiff must allege not only a domestic transaction, but also domestic, not extraterritorial, conduct by defendants that is violative of the CEA. The manipulative conduct that the plaintiff alleges in the complaint – and this is at paragraph 158 – is manipulating the prices of Euro-Yen-based derivatives through submission of false Yen-Libor and Euro-Yen-Thai-Bor rates to the JBA and the BBA. That's the alleged manipulative conduct. That conduct, as alleged in the complaint, occurred exclusively abroad. Stop submissions sent from people abroad to recipients abroad involving foreign loans denominated in foreign currencies in the foreign overseas market. So that's – the conduct that the complaint alleges as the manipulation is exclusively foreign. Deal with opposing counsel's argument that the transaction took place in this country on those two exchanges that we're talking about. The transaction did. It was purchased by the CME or the CEA. Precisely the same is true in prime, Your Honor. The plaintiffs in that case traded futures contracts, including on – I don't think it was the CME. I think it was a different – but domestic as well as international, but domestic exchange for – there it was the Brent Oil futures contract that they were trading. And the court nonetheless said because the – What is the thing they were trading? What is the thing? Well, so that's another problem with plaintiff's theory. Our case doesn't depend on the question whether a benchmark is a commodity or not, but we think it's clearly not because it doesn't fit the statutory definition. Brent Oil is a commodity, and that was what was at issue in prime. And nonetheless, this court said the fact that there's a real commodity and there are real futures contracts in that commodity being traded in the United States by the plaintiffs and they allegedly suffered losses as a result of this foreign manipulative conduct. Nonetheless, the manipulative conduct itself that allegedly caused the losses in the United States in U.S. transactions occurred abroad. So if we were to assume your adversary's argument is correct that the rates are commodities, even then under prime it's still extraterritorial? Correct, because, again, in prime there was no dispute. Brent Oil crude is a commodity that could be physically delivered, unlike you can't physically deliver a benchmark. And a benchmark is not itself an interest that you could incorporate into a contract, right? That would be interest. But the setting of the LIBOR or TIBOR itself is not setting an interest. No one has any interest in whatever number comes out of the JBA unless they choose, through independent third-party decisions, to create their own interest between themselves and a contract, which is obviously quite separate and apart from whatever the JBA or the BBA is doing. But, again, the key issue under prime is the locus of the alleged manipulative conduct. There it was foreign, here it is exclusively foreign, and that's the end of the matter. Plaintiffs rely on incidental alleged contacts with the U.S. Like they say, some communications may have been routed through servers in the U.S., but that's purely incidental. But what about the contention that there is an intention for this to have an impact in the U.S.? The alleged conspiracy of this scheme was directed in part to the United States. So two responses, Your Honor. First of all, in Park Central, which was a securities extraterritoriality case, but which this court in prime adopted as setting the correct standard as applied to the CEA as well. In Park Central, the defendants were alleged to have intentionally made misrepresentations, at least intentionally designed to mislead investors around the world, including, therefore, in the United States, which is where the plaintiffs traded and claimed they were injured. And this court said, nonetheless, the question is not what the intent was, but where the conduct occurred. Indeed, in that case, that was a harder case for the defendants than this one, because in that case, most of the misrepresentations were made abroad, but some of them were communicated into the United States and even made in the United States. And, nonetheless, this court said, well, the scheme overall was predominantly extraterritorial and, therefore, the securities laws do not apply. A fortiori here, where all of the alleged manipulative conduct itself occurred abroad, it's extraterritorial. And, moreover, on the question of intent, there's no allegation here supported by any specific facts that the intent of the defendants was to target futures trading on the CME. And it would make no sense for that to be the case. What the specific allegations, the factual allegations in the complaint and in the attachments, they cite hundreds of alleged manipulative efforts. And what they're talking about in those specific allegations is attempts to manipulate swaps and other over-the-counter direct transactions between the banks and counterparties in order to profit from the bank's perspective on the setting of LIBOR, because those swaps and other over-the-counter derivatives have specific reset dates when, depending on the LIBOR rate, a lot of money can change hands. But those are quite different from the futures contracts at issue here, and it wouldn't make sense to try and use the alleged manipulation of LIBOR, of yen LIBOR, to manipulate futures contracts, because, of course, futures contracts trade and fluctuate on a daily basis. They aren't determined by the setting of yen LIBOR on a particular date. Indeed, as we've shown in our brief, if they were, a plaintiff would have made money instead of losing money. But it's simply not the case. The yen LIBOR and your yen TAIBOR are set once per day. Futures contract prices fluctuate throughout the day, and so there's simply no direct connection there. It wouldn't make any sense, therefore. And, again, the specific factual allegations in the record make clear that what the defendant's traders were targeting were over-the-counter derivatives, not futures contracts. So both as a matter of law and as a matter of the allegations, the plaintiff's theory about intent does not work here. Sorry, one final point on the CFTC, the argument that the court should wait to try to get the views from the CFTC. The CFTC filed an amicus brief in prime. This court considered the CFTC's views, ruled as it did, and prime compels affirmance here. So that we fail in protecting Mr. Layton and anyone else in his class because we can't do it. Is that what you're saying? Well, Congress has actually chosen to extend the Commodity Exchange Act extraterritorially in certain circumstances with respect to swaps. They have not chosen to do so with respect to the futures contracts. And so plaintiff's Commodity Exchange Act claim is barred by fundamental principles of extraterritoriality, just as the plaintiff's claim in prime was barred by those same principles. Are plaintiffs made aware that they can't seek protection in the courts for this manipulation? Does anyone ever tell them? Do they learn when they purchase these things that they can't go to court and get vindicated for manipulation? Well, I mean, I think people are assumed to know the background principles of law, including extraterritoriality. But I mean, more fundamentally, it's not like this is the only problem with the plaintiff's case, right? I mean, as we've shown in our brief, the plaintiffs actually have not alleged any way in which they suffered an injury from the purported manipulations that they are seeking to challenge here. They don't even allege any manipulations of Uriah and Tibor during the time period in which they traded. And if their allegations, if their theory of harm were true, they would have made money instead of losing. Right. I understand what you're saying. But it's buyer beware. Are the buyers told that they can't get into court? Well, it's true that the principles of extraterritoriality recognized by the Supreme Court and this court mean that in certain circumstances it's possible to have an injury in the United States that has to be remedied abroad. And there are cases pending abroad where plaintiffs are suing these same defendants in foreign courts in London and other places around the world for damages based on their conduct. It's not like the United States courts are the only sources of liability. And, of course, federal regulators and foreign regulators have imposed substantial penalties, including restitutionary penalties on various defendants. So there are a wide array of remedies. The fact that Congress has not chosen to extend the Commodity Exchange Act extraterritorially for this particular category of alleged conduct does not mean that there are no remedies. Thank you. Thank you, counsel. We'll hear next from Mr. Gottrich. Yes, thank you, Your Honor, and may it please the court. If this court does not affirm the dismissal of all claims as against all defendants, it should still affirm the dismissal as to LBG, Lloyds Banking Group, PLC, for lack of personal jurisdiction. That dismissal predated, as the plaintiff pointed out, Schwab and Ford. But those intervening decisions do not change anything. The result is the same in 2022 as it was in 2017. Jurisdiction is still lacking as to LBG. Now, LBG is a non-operating U.K. holding company. It is not even alleged in the 900 paragraphs of the complaint to have joined any conspiracy. It is not alleged anywhere to have committed any suit-related conduct anywhere. So there's no purposeful availment here anywhere, but certainly not in the United States, which makes this utterly unlike the Ford case. In addition, the plaintiff fails the Schwab conspiracy jurisdiction test right at the second requirement, the second prong requires the defendant have participated in the alleged conspiracy. But there's no such allegation as to LBG. And this court stated in the Schwab case that due process requires that courts assess individually the facts as to each particular defendant in a corporate family, and particularly the particular company within the family that has been sued by the plaintiff. And in this case, the only entity in the Lloyds family that was sued was LBG. Now, to be sure, in the third amended complaint, which is the document in which LBG was added as a defendant in 2016, the plaintiff alleged that LBG's U.K. subsidiary, Lloyds Bank, which is an operating British bank, engaged in certain Yen-Libor-related conduct, but he didn't sue Lloyds Bank. And that was a choice. That was not some inadvertence. That was not some oversight. And we know that because if you look at the allegations in the third amended complaint that relate to Lloyds Bank, and derivatively they would argue to LBG, all of those come right out of the settlements that LBG and Lloyds Bank made with the CFTC, the Department of Justice, and by the way, at the same time, with the Financial Conduct Authority of the United Kingdom back in 2014, 19 months earlier. And in fact, the settlement documents with the U.S. agencies, which comprise something like 90 pages of this record, were attached by the plaintiff to the complaint, to the third amended complaint. So he had that information for 19 months, and he made a conscious decision, I'm not going to sue Lloyds Bank. I'm going to sue LBG. Counsel, you joined the red brief about conspiracy jurisdiction. Isn't that correct? I'm sorry, I didn't quite hear you, Your Honor. You joined the red brief on conspiracy jurisdiction? Yes. But now all the other parties, ICAP, TULIP, IEL, have settled. So it's unclear whether Lloyds intends to pursue this conspiracy jurisdiction. Yes, we do, Your Honor. But they're not even mentioned by Layden in the complaint. Right. The complaints, it's very interesting, Your Honor. So you're pursuing conspiracy. We are arguing that there is no conspiracy jurisdiction at all. The other three defendants Your Honor mentioned are separately represented by different counsel in a different law firm. We joined together in one brief because we had these common issues. They reached a settlement in principle with plaintiffs, and the plaintiff made the motion that Your Honors have seen in the last couple of days. We did not. We are not settling, and we insist that there is no conspiracy jurisdiction or any kind of jurisdiction. And so what the plaintiff did here is a tactic. I don't know why he did it, but he did it. He chose instead of suing Lloyds Bank to say in his third amended complaint that whatever Lloyds Bank did should be attributed to LBG, the parent company, on the basis of an alter ego theory. Judge Daniels considered that. He ruled at Special Appendix 81 on exactly that point. And the plaintiff now on appeal has not challenged the alter ego ruling. As a result, any such argument has been waived, and there is no pathway for the plaintiffs, even if there was some sort of allegation that Lloyds Bank did something in the United States, which there isn't, there's no pathway to get from Lloyds Bank's conduct to LBG's conduct. That has entirely been waived. And I should add, Your Honor, that if there's a 30-paragraph or 31-paragraph section of the third amended complaint where they list all their jurisdictional allegations, it's paragraphs 90 to 120, it's JA 3667 to 3682. You will not find in 15 pages a single mention of either Lloyds Bank or LBG. That's why I asked if you were continuing in this pursuit of your response. Yes, and our argument is that there is no personal jurisdiction over LBG, either directly as to LBG, nor is there an argument based on Lloyds Bank. Now, just add one other thing, Your Honors, that the plaintiff did not move in the court below for a leave to add Lloyds Bank as a defendant. Instead, what the plaintiff did was make an offhanded request in a footnote in the opposition memorandum. When LBG moved to dismiss for lack of jurisdiction, the opposition memorandum, which is docket 664 in the district court, at footnote 15, there is buried this footnote that says, in the event that the court grants LBG's motion and dismisses because there's no jurisdiction over LBG, we would like the opportunity to bring up Lloyds Bank as a defendant. And Judge Daniels didn't have to reach that because it was buried in a footnote in an opposition memo, but he did. And he stated at special appendix — I think we have your argument, counsel. You're well over your time. Oh, I'm sorry, Your Honor. If I just can wrap up. Just wrap up. In 2017, the court below correctly found there was no personal jurisdiction as to LBG. And nothing about Schwab or Ford or any other decision changes that. The judgment below should be affirmed. Thank you, Your Honors. And next is Ms. Saharsky. Good morning. I'm here to address the cross appeal, which is the foreign banks that should have been allowed to raise the personal jurisdiction defense after Gucci. And the bottom line is that the district court should have allowed it. Because before Gucci, it was absolutely clear the law in the Second Circuit foreclosed our argument. After Gucci, it is absolutely clear that we can't be subject to general personal jurisdiction. You prevailed below. Can't you take yes for an answer? I'm sorry? You prevailed below. Can't you take yes for an answer? We'd love to, Your Honor. And this is an alternative argument, of course. It's only because these are foreign banks with nothing but really branch offices in the United States. And the law is so clear after Gucci that just having a branch in the United States can't subject you to general personal jurisdiction here. It's important to the banks in this case and for other cases to make clear that they just don't belong in the courts here. So just for the sake of argument, if we affirm the district court, you are asking us to reach your issue no matter what? No, we're not asking you to reach our argument if you affirm the dismissal of the complaints. It's simply that if you did not affirm the dismissal of the complaints, we would want to raise this personal jurisdiction argument. And we think that that's fair because Daimler just did not specifically address the New York corporate presence rule. Isn't it the case, though, that other parties did, in a similar position to yours, did in fact raise the personal jurisdiction argument sooner? And so the idea that you weren't able to raise it, why should your failure to raise it be excused, I guess? Well, some of the defendants, four of them, were differently situated because they had absolutely no branch offices in the United States. Now, some of the defendants, ten of them, were similarly situated. They could raise the argument, but we didn't have to. I think that's the key, is that the argument remained foreclosed until the Second Circuit decided Gucci. And I just want to tell you the evidence for that. I mean, one important piece of evidence is that the district courts after Daimler continued to apply the corporate presence rule. We couldn't find a single district court that said that Daimler had abrogated that rule. And actually, when this court, after Daimler, had a chance to address it, before Gucci, in a case called Sanera, it said that there was some tension between Daimler and the corporate presence cases, but that they'd have to be revisited in a future case. So it just really wasn't until Gucci that this was clear. I mean, the plaintiff, for their part, was arguing that Daimler did not change the law and that this corporate presence rule remained good law. And so it just really wasn't clear until Gucci. And this court has cautioned finding forfeiture of a personal jurisdiction defense because of the due process concerns. We think that's especially true here where we're talking about foreign defendants. And so this is an alternative argument, one that the court doesn't have to reach if it affirms the dismissal of the complaint. But we just don't think that it was right to say that we had to raise it after Daimler, in light of what was happening with plaintiff's arguments, the district courts, this court, and what it said in Sanera, etc. So we just wanted to make sure that we had a chance to get that important point across. Thank you. Thank you. Mr. Citron, you've reserved three minutes for rebuttal. Thanks. I do think the defendants have slowly led the court from Park Central through Prime and, in this case, to a very dangerous conclusion. When people trade on the CME, they expect to be protected from manipulation, whether or not the malign actors happen to be located abroad while they're doing it. And what the court would be saying if it says that this does not count as a territorial application of U.S. law is that the CEA, the Commodity Exchange Act, which protects against manipulation, just does not apply to the intentional manipulation of domestic commodities if you happen to be standing abroad when you do it. So if you use foreign tools, even through the U.S. wires, to manipulate the price of oranges or other commodities, that just does not count as a territorial application of U.S. law. That would be a radical change in the regulatory authority of the CFTC, the criminal authority of the Justice Department. Would it be radical? Would it be radical after the Schwab cases and the Park Central and Prime? Would it be radical? It would, actually, because in Schwab 2, we held, the court held, that you could, there was enough domestic conduct to subject this conspiracy, or the overlapping conspiracy, to personal jurisdiction in the United States on the basis of the same conduct, Eric Bowman Saff's participation in the conspiracy from the Barclays office in the United States. And the other thing I want to stress is even if you disagree with me that the intentional manipulation of a domestic commodity suffices, there's tons of domestic conduct alleged in the complaint. The most important instance of which is Deutsche Bank just admitting, this is at JA1357, just admitting that its New York branch participated in the intentional manipulation of Euro Yen Tybor. The defendants really like to cherry pick what the complaint says are just the examples of manipulation that we know about to say that, you know, we can't allege injury or this is really about Yen Lybor. Were there any actual, were there false submissions made from the United States, or is it just a matter of there was a direction from someone in the United States to manipulate and then the false submission was actually made abroad? The direction in this instance comes from the manager who's in the United States. But not the actual Yen Lybor? The actual Yen Lybor submitter, I think, is sitting in another office when they make the submission. But in the, I guess it's never been questioned previously whether an express direction to manipulate coming from the United States would count as domestic conduct. I think that clearly is, I mean, it's a violation of the statute to say, you know, to your subordinate, please break this U.S. law. And that's exactly what he did. Right, although if the actual illegal, wrongful conduct does happen abroad, I guess I'm still hung up a little on the idea that having the intention in the United States or making a direction from the United States when the actual wrongful conduct, the false submission, the behavior that resulted in this manipulation occurred abroad. I think it's a conspiracy, and that may help to resolve it. So if you're conspiring from the United States, you're also violating the statute at that time. And the overt act in furtherance would be to direct your subordinate to make a false submission. So, you know, I think there clearly is a U.S. violation. And the same goes for all the acts of U.S. wire fraud that the defendants have admitted to. You know, there are lots and lots of domestic conduct hooks for this conspiracy to be treated as a domestic conspiracy, without regard to the fact that, again, the manipulation of a U.S. domestic commodity was intentional. And, you know, there are lots of malign actors around the world who will be very happy to figure out how to manipulate the futures contract in Bitcoin. And they'll do it from Russia, from China, from places where they are not subject to regulation. And the holding that the defendants are asking you to reach would say, sorry, buyer beware, this may be manipulated by foreign malign actors. We don't know, and it's not our job to stop it. And I think that really cannot be right. And, really, the CFTC should be heard on that question. Okay. Thank you all. We'll take the case under advisement. That concludes our arguments for today. So I'll ask the courtroom deputy to adjourn. Court is adjourned.